**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Cardinal Land Conservancy, Inc.,  )
                                   )
    Plaintiff,                     )   Case No.: 1:18-cv-00534
                                   )
vs.                                )   Judge Michael R. Barrett
                                   )
United States Department           )
of Agriculture., *et al.*,         )
                                   )
    Defendants.                    )

## <u>OPINION & ORDER</u>

This matter is before the Court on the Motion for Summary Judgment filed by

Plaintiff Cardinal Land Conservancy, Inc. (Docs. 37, 40, 41) and the Motion for Summary

Judgment filed by Defendants United States Department of Agriculture; Secretary, United

States Department of Agriculture; National Appeals Division; Director, National Appeals

Division; National Resources Conservation Service; Acting Chief, Natural Resources

Conservation Service; State Conservationist, Natural Resources Conservation Service;

and Commodity Credit Corporation (collectively, "Federal Defendants") (Docs. 38, 39).[1]

## I.  <u>BACKGROUND</u>

### a.  <u>The Parties</u>

Plaintiff is a non-profit land trust headquartered in Milford, Ohio, that helps

preserve natural land and farmland in Southwestern Ohio.[2] Plaintiff works closely with

---

[1] Defendant Ohio Department of Agriculture and Defendant Director, Ohio Department of Agriculture did not file a motion for summary judgment or respond to the pending Motions for Summary Judgment as the legal question before the Court predominately involves Plaintiff and the Federal Defendants.

[2] Plaintiff's predecessor was an organization called Citizens' Land Conservancy of Hamilton County Ohio, Inc. ("Citizens' Land"). Sometime before March 2016, Citizens' Land merged with two other land trusts to

landowners who want to legally preserve their land. The property at issue consists of two parcels of land ("Parcels") that combine for a total of 154.40 acres and lie directly east of the Great Miami River. (Doc. 22-4 PageID 360); (Doc. 29-2 PageID 641-51). Carriage House Farm Services, LLC ("Carriage House Farm")—a registered sesquicentennial farm owned by the same family for over 150 years[3]—owns the Parcels. (Doc. 22-4 PageID 361). Carriage House Farm currently grows corn, soybeans, and vegetables, and also boards approximately 30 horses on the Parcels. (*Id.*) Plaintiff works with Carriage House Farm to preserve the Parcels.

Defendant United States Department of Agriculture ("USDA") is a federal executive department made up of federal agencies.[4] Defendant National Resources Conservation Service ("NRCS") is an agency within Defendant USDA and provides conservation planning and assistance programs to landowners.[5] Defendant NRCS implements its various programs using the funds, facilities, or authorities of Defendant Commodity Credit Corporation, a wholly-owned government corporation within Defendant USDA. (Doc. 29-2 PageID 476, 480, 512). Defendant National Appeals Division ("NAD") is an independent office within Defendant USDA that conducts administrative appeals hearings of adverse program decisions by, inter alia, Defendant NRCS.[6] 7 C.F.R. § 11.2.

---

form Plaintiff. (Doc. 22-4 PageID 362); (Doc. 29-2 PageID 652-57). For ease of reference, the Court will refer to Citizen's Land's actions in this matter as Plaintiff's actions.

[3] A brother and sister currently own Carriage House Farm. (Doc. 22-4 PageID 361). The brother works on the farm. (*Id.*) The sister does not as she lives outside of Ohio. (*Id.*)

[4] Defendant Thomas J. Vilsack is the Secretary of Defendant USDA.

[5] Defendant Terry Cosby is the Chief of the Natural Resources Conservation Service.

[6] Defendant Frank M. Wood is the Director of the National Appeals Division.

One of the assistance programs that Defendant NRCS implements is called the Agricultural Conservation Easement[7] Program. 16 U.S.C. § 3865 et. seq.; (Doc. 29-2 PageID 525). One purpose of the Agricultural Conservation Easement Program is to protect the agricultural viability and related conservation values of eligible land by limiting nonagricultural uses of that land. (Doc. 29-2 PageID 525). Stated otherwise, one purpose of the program is long-term agricultural protection. The Agricultural Conservation Easement Program is one easement program with two easement enrollment components: agricultural land easements and wetland reserve easements. 16 U.S.C. § 3865a; (Doc. 29-2 PageID 525). Pertinent here, an agricultural land easement is an easement or other interest in eligible land that is conveyed for the purpose of protecting natural resources and the agricultural nature of the land; and permits the landowner the right to continue agricultural production and related uses. 16 U.S.C. § 3865a(1).

**b. 2015-2016**

On September 18, 2015, via letter and in response to Plaintiff's application, Defendant NRCS offered Plaintiff enrollment of the Parcels into the Agricultural Conservation Easement Program for an agricultural land easement. (Doc. 29-2 PageID 637). Defendant NRCS instructed Plaintiff to return two signed documents, one titled "Notice of Grant and Agreement Award" and another titled "Cooperative Agreement," to move forward on the application. (*Id.*) Defendant NRCS noted that Plaintiff's "easement grantees must provide clear title and written, recordable right of access to the easement area" and that "[t]his may require obtaining subordination

---

[7] "[A]n easement is an interest in the land of another, created by prescription or express or implied grant, which entitles the owner of the easement to a limited use of the land in which the interest exists." (Doc. 22-4 PageID 367) (quoting *Andrews v. Columbia Gas Transmission Corp.*, 544 F. 3d 618, 624 (6th Cir. 2008)).

agreements from a bank or other lending institution for any debts that may encumber the property." (*Id.*)

On September 21, 2015, Plaintiff, Defendant NRCS, and Defendant Ohio Department of Agriculture entered into a 3-year Cooperative Agreement for the purchase of the agricultural land easement to protect the agricultural use of Parcels. (*Id.* PageID 641-51). Pursuant to the Cooperative Agreement, Defendant NRCS agreed to provide Plaintiff a $385,000.00 grant—that was to be combined with $171,542.00 in funding from Defendant Ohio Department of Agriculture—that would be used to purchase the agricultural land easement. (*Id.*) Pursuant to the Cooperative Agreement, Plaintiff agreed to "ensure that the title to the lands or interests therein will be unencumbered or that outstanding or reserved interests are subordinated to the agricultural land easement." (*Id.* PageID 646).

### c. 2016-2017

On March 23, 2016, Attorney G. Robert Hines, Plaintiff's title agent, provided a title opinion letter—addressed to representatives for Defendant NRCS and Defendant Ohio Department of Agriculture and carbon copying Plaintiff's representative—that sets forth the state of the title for the Parcels. (*Id.* PageID 703-06); *see* (Doc. 29-3 PageID 840-41). Attorney Hines explained that a Commitment of Title Insurance would issue, in the name of Defendant Ohio Department of Agriculture and the amount of $171,542.00, within 14 days of the date of that letter. (Doc. 29-2 PageID 703). Attorney Hines found that the fee simple title to the Parcels is vested in Carriage House Farm. (*Id.* PageID 705). He then found that the Parcels are subject to certain exceptions including, inter alia, flowage easements in favor of the United States. (*Id.*) The title insurance commitment,

accordingly, listed those flowage easements as exceptions to the title insurance coverage. (*Id.* PageID 703 - Doc. 29-3 PageID 770-824, 827-29). Attorney Hines opined that, subject to his findings regarding the certain exceptions, the title to the Parcels is good and marketable. (Doc. 29-2 PageID 706).

The flowage easements in favor of the United States are specifically in favor of the United States Army Corps of Engineers ("USACE"), and are associated with the operation of the Markland Locks and Dam on the Ohio River. (*Id.* PageID 740-73). The flowage easements allow the USACE to permanently flood the land on the Parcels that is below elevation 456 feet Mean Sea Level ("MSL"); allow the USACE to occasionally flood the land on the Parcels that is above elevation 456 feet MSL; allow the USACE to clear and remove any brush, debris, and natural obstruction that is below elevation 463 feet MSL; and prohibit the construction of any structure on the land without written approval of a USACE representative. (*Id.*)

In August 2016, one of Defendant NRCS's two primary representatives on the Parcels' project emailed the other Defendant NRCS primary representative on the project regarding the title opinion letter. (Doc. 29-3 PageID 831-32). She stated that she read the USACE flowage easements to mean that the USACE could permanently flood any land on the Parcels that is below elevation 500 feet, and questioned whether NRCS should request a subordination before proceeding with the agricultural land easement on the Parcels. (*Id.*)

In September 2016, via email, Defendant NRCS's two primary representatives project continued to question whether NRCS should proceed with project in light of the USACE flowage easements. (*Id.*) The two representatives first questioned whether

Parcels are already protected due to the USACE flowage easements, as the easements prohibit construction of infrastructure on the land. (*Id.*) The representatives next questioned whether the USACE flowage easements would permit long-term agricultural protection on the Parcels, as the easements permit permanent flooding on a large portion of the land. (*Id.*) One representative stated that, based on her review of a map[8] of the Parcels and the USACE flowage easement language, she thought that the USACE easements permitted the USACE to permanently flood 90% of the Parcels. (*Id.*) The other representative, in response, wondered if Plaintiff could request that the USACE release the flowage easements. (*Id.*)

### d.  January 2017 – July 18, 2017

On April 26, 2017, Attorney Hines—in an email to, inter alia, the primary representatives working on the Parcels' project for Plaintiff, Defendant NRCS, and Defendant Ohio Department of Agriculture—explained that the USACE has had flowage easements up and down the Ohio River, and all of the rivers flowing into it, since the construction of the Markland Dam in 1964. (*Id.* PageID 838-39). He explained that the flowage easements shield the USACE from liability for claims by land owners whose property abuts the Ohio River and the Great Miami River for any flooding that results from closing the dam gates. (*Id.*) He opined that the USACE would never consider a request for a release or subordination of the flowage easements. (*Id.*)

Later that day, a Defendant NRCS employee—who was not on Attorney Hine's earlier email, is not one of two NRCS primary representatives on the Parcels' project, and who is an NRCS realty specialist who works for an easement support services team—

---

[8] It is not clear what map she was reviewing at that time.

sent an email to, inter alia, Attorney Hines and the primary representatives on the Parcels' project for Plaintiff, Defendant NRCS, and Defendant Ohio Department of Agriculture. (*Id.* PageID 845-46). In it, the Defendant NRCS employee explained that NRCS did not require a subordination for the USACE flowage easements, and he did not foresee the flowage easements being an issue for NRCS to move forward on the Parcel's enrollment in NRCS's Agricultural Conservation Easement Program. (*Id.*)

However, in an April 27, 2017 email from one of Defendant NRCS's primary representatives to Defendant Ohio Department of Agriculture's primary representative, NRCS's primary representative indicated that NRCS remained uneasy with the USACE flowage easements and noted that, in the past, NRCS had cut similar easements out, as the land is already protected. (*Id.* PageID 838).

On May 15, 2017, via email, one of Defendant NRCS's primary representatives asked Plaintiff's primary representative to provide Defendant NRCS with a map directly from the USACE that specifically shows the permanent and temporary pool lines found in the USACE flowage easement language. (*Id.* PageID 844-45). Defendant NRCS explained that it needed this map to make its final decision regarding enrolling the Parcels in the Agricultural Conservation Easement Program. (*Id.*) One week later, via email, Plaintiff's primary representative forwarded maps obtained from the USACE to, inter alia, one of Defendant NRCS's primary representatives. (*Id.* PageID 834).

On June 6, 2017, via email, one of Defendant NRCS's primary representatives informed Plaintiff's primary representative that, unless Plaintiff can obtain a subordination or release of the USACE flowage easements, Defendant NRCS will not fund the project or enroll the Parcels in the Agricultural Conservation Easement Program. (*Id.*

PageID 847).

On June 12, 2017, Plaintiff's primary representative emailed, inter alia, one of Defendant NRCS's primary representatives and Defendant Ohio Department of Agriculture's primary representative. (*Id.* PageID 849). Plaintiff's representative reiterated the USACE easement language that permits permanent flooding on the land that is below elevation 456 feet MSL; attached a different map of the Parcels, that includes contour lines from Hamilton County Cincinnati Area Geographic Information Systems,[9] that Plaintiff states shows that almost all of the land in the Parcels is above 456 MSL; reiterated the statements made in the April 2017 email from Defendant NRCS's employee that the USACE flowage easements are not a problem; stated that occasionally flooded land makes for the best farm ground; and concluded that Plaintiff's application for the Parcels should move forward. (*Id.*)

On June 14, 2017, Plaintiff's primary representative emailed, inter alia, Defendant NRCS's two primary representatives and explained that there might be some confusion regarding what the forwarded maps from the USACE portrayed. (*Id.* PageID 852). Plaintiff's representative explained that he followed up with the USACE about the maps and the USACE was unable to tell him where the elevation lines were located on the map because the USACE did not have the data to determine contour lines. (*Id.*) He clarified that the USACE maps did not specifically show the distinct permanent and temporary pool lines of the USACE flowage easements, and that the USACE would not supply such

---

[9] The contour map from Cincinnati Area Geographic Information Systems used light detection and ranging data to create the map (Doc. 22-8), and thus did not use a physical survey of the land to create the map.

a differentiating map without first physically surveying the land.[10] (*Id.*) He explained that the forwarded maps, instead, show the land covered by both the permanent and temporary flooding portions of the USACE's flowage easements. (*Id.*) He noted that the map from Cincinnati Area Geographic Information Systems includes contour lines and, using that map, the overwhelming majority of the Parcels is above 456 MSL and thus not subject to permanent flooding by the USACE easement. (*Id.*)

In a July 11, 2017 email from Defendant Ohio Department of Agriculture's primary representative to Plaintiff's primary representative and one of Defendant NRCS's primary representatives, Defendant Ohio Department of Agriculture informed the parties that it would move forward with its $171,542.00 portion of the funding on the Parcels' project despite the USACE's flowage easements and NRCS's hesitation. (*Id.* PageID 853).

### e. July 19, 2017 ineligibility determination

In a July 19, 2017 letter—that appears to have been emailed to Plaintiff on August 24, 2017—Defendant NRCS informed[11] Plaintiff that NRCS determined that Plaintiff's application for the agricultural land easement was ineligible because Plaintiff could not provide clear title for the Parcels in light of the USACE flowage easements. (Doc. 29-2 PageID 470-72) (citing Agricultural Conservation Easement Program Manual 440 – 528.62.7). Stated differently, Defendant NRCS found the USACE flowage easements to be an unacceptable exception to clear title. (*Id.*) Defendant NRCS informed Plaintiff that it could either request substitution of an eligible parcel in place of the Parcels,

---

[10] It appears that such surveying did not occur. *Compare* (Doc. 29-3 PageID 852), *with* (Doc. 22-4 PageID 363-64), *and* (Doc. 22-8 PageID 411-12).

[11] Defendant State Conservationist of Defendant NRCS signed the letter, as the State Conservationists is ultimately responsible for ensuring that the Agricultural Conservation Easement Program agricultural easements are implemented at the state level. (Doc. 29-2 PageID 470-71, 531).

or seek an administrative review of this ineligibility determination through the administrative appeals process. (*Id.*)

### f. **January 2018 Administrative Judge decision**

Plaintiff timely sought administrative review of Defendant NRCS's ineligibility determination,[12] and the assigned Administrative Judge held a hearing and then closed the administrative record. (Doc. 22-4 PageID 360). The Administrative Judge found that Plaintiff established that Defendant NRCS's July 19, 2017 ineligibility determination was erroneous.[13] (*Id.*) He explained that, under Defendant NRCS's rules, an existing easement constitutes an unacceptable exception to clear title only when the easement carries a high likelihood of resulting in conversion to nonagricultural use. (*Id.* PageID 366). He found that the existing USACE flowage easements do not constitute an unacceptable exception to clear title on the Parcels because the facts do not show that those easements carry a high likelihood of conversion of the Parcels to nonagricultural use. (*Id.* PageID 360).

First, the Administrative Judge acknowledged Plaintiff's responsibility to provide clear title to the land offered for enrollment into the Agricultural Conservation Easement Program and that the USACE confirmed that Plaintiff had not requested a waiver of the flowage easements. (*Id.* PageID 369).

---

[12] Separately, in a July 31, 2017 email from Plaintiff's primary representative to one of Defendant NRCS's primary representatives, Plaintiff indicated that a Carriage House Farm owner disagreed with Attorney Hines' title work and would obtain an additional title examination to be certain that the USACE flowage easements affect the Parcels. (Doc. 29-3 PageID 856). The record does not indicate whether additional title work occurred.

[13] The Administrative Judge was to determine if Plaintiff had established that the Defendant NRCS's July 19, 2017 ineligibility determination was erroneous by a preponderance of the evidence. *See* 7 C.F.R. § 11.8(e) ("The appellant has the burden of proving that the adverse decision of the agency was erroneous by a preponderance of the evidence.").

Second, the Administrative Judge determined that the USACE flowage easements do not already protect the Parcels because, although the easements prohibit construction of shelter on the land, the easements do not prohibit sand and gravel mining. (*Id.* PageID 366). He found that agriculture and mining are the only two possible uses of the Parcels in light of their location on a flood plain. (*Id.* PageID 362). He explained that the Parcels have been valued at $1.5MM for sand and gravel mining,[14] and that any mining on the Parcels would go down below an aquifer and the land would become a lake if mined. (*Id.* PageID 360, 362, 366). He found sand and gravel excavation to be an obvious threat to both the Parcels' continued use for agriculture and the continuance of the sesquicentennial farm. (*Id.* PageID 366). He found that Defendant NRCS's ineligibility determination ignored this obvious threat. (*Id.*)

Third, the Administrative Judge determined that Defendant NRCS's concern about the USACE flowage easements' ambiguity is misplaced. (*Id.* PageID 367). He found that that the USACE flowage easements do not apply to the entire acreage of the Parcels. (*Id.* PageID 361). He found that the USACE maps are aerial images with the flowage easements outlined in red, but do not indicate any elevation points or contain a legend. (*Id.* PageID 363). He explained that the USACE clarified that the flowage easements outlined in red show the land covered by both the permanent and temporary flooding portions of the USACE's flowage easements, and that the USACE could not clarify any

---

[14] The first reference to the possibility of mining on the Parcels appears is in the Administrative Judge's decision. (Doc. 22-4 PageID 360, 362, 366). At the hearing before the Administrative Judge, thus before the Administrative Judge closed the record, Plaintiff argued that the Parcels are not adequately protected by the USACE flowage easements, as sand and gravel mining are a genuine risk to the Parcels' continued agricultural use in light of newer generations of the Carriage House Farm owners who will eventually inherit the property and have no emotional connection to the farm. (*Id.* PageID 360). The Administrative Judge explained that Carriage House Farm's current owners, *i.e.*, not the newer generations, agreed to encumber the Parcels via the agricultural land easement from Defendant NRCS and, in by so, agreed to significantly decrease the land's value to the newer generations who will inherit it. (*Id.* PageID 361).

elevation points on the maps without a survey. (*Id.*)

He then found the Cincinnati Area Geographic Information Systems map to be more credible.[15] (*Id.* PageID 364, 367). He found that Cincinnati Area Geographic Information Systems map reveals that the acreage making up the area that the USACE can permanently flood consists of no more than 2% of the Parcels and the acreage making up the area that the USACE can occasionally flood is approximately 13% of the Parcels. (*Id.* PageID 364, 367). With respect to the 2% of the Parcels that the USACE flowage easements allow permanent flooding, he found that this area is currently not used for agricultural purposes as it is already permanently under water. (*Id.* PageID 367). With respect to the 13% of the Parcels that the USACE flowage easements allow occasional flooding, he found that the history of the easements—*i.e.*, only two floods in the 55 years since the flowage easements' inception—reveals that any occasional flooding will be a rare event and will not interfere with the agricultural use of the land. (*Id.* PageID 368).

In sum, and largely based on the Cincinnati Area Geographic Information Systems map and Parcels' occasional flooding history, the Administrative Judge found that Defendant NRCS incorrectly interpreted the USACE flowage easements, erroneously concluded that the USACE was likely to exercise their rights under those easements, and incorrectly determined that the USACE easements are an unacceptable right on the title of the Parcels. (*Id.* PageID 369).

### g. August 2018 NAD Director Determination

Defendant NRCS timely requested that the Director of NAD ("Defendant NAD Director") review the Administrative Judge's decision. (Doc. 22-5). Plaintiff timely

---

[15] Defendant NRCS argued that the Cincinnati Area Geographic Information Systems map was ground-truthed and thus not reliable. (Doc. 22-4 PageID 368).

submitted a Response to the Request for Director Review. (Doc. 22-6). In an untimely determination, Defendant NAD Director reversed the Administrative Judge's decision. (Doc. 22-8); *see* 7 U.S.C. § 6998(b)(1) (providing that the Director shall complete his review and issue a final determination or remand not later than 10 business days after receipt of the request for review received by the agency); 7 C.F.R. § 11.9(d)(2) (same).

###  h.  Proceedings before the Court

Plaintiff brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and seeks judicial review of Defendant NAD Director's August 2018 determination. (Doc. 22); *see* (Doc. 1). Plaintiff asks the Court to set aside Defendant NAD Director's determination, reinstate the Administrative Judge's decision, direct Defendant NRCS to fund the Agricultural Conservation Easement Program agricultural land easement grant in Plaintiff's favor, and award costs and fees under the Equal Access to Justice Act ("EAJA"). (Doc. 22 PageID 302). The parties have filed cross motions for summary judgment. (Docs. 37, 38).

## II.  STANDARD OF REVIEW

The APA provides for judicial review of final agency actions. *Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016) (citing 5 U.S.C. § 702). Summary judgment is an appropriate procedure when a court reviews an agency's administrative record. *See id.* However, given the district court's limited role in reviewing an administrative record—because, under the APA, the agency, not the district court, finds facts and reaches a decision based on the administrative record—the summary judgment

standard found in Federal Rule of Civil Procedure 56(a)[16] does not apply to judicial review of final agency action under the APA. *See Daraghma v. U.S. Citizenship & Immigr. Servs.*, 228 F. Supp. 3d 818, 822 (N.D. Ohio 2017). Rather, the standard of review for a district court ruling on a motion for summary judgment under the APA is whether, as a matter of law, the agency decision is supported by the administrative record and consistent with the APA standard of review. *See id.*

Pertinent here, a final determination by Defendant NAD Director is reviewable by the Court in accordance with the APA. *See* 7 U.S.C. § 6999; 7 C.F.R. § 11.13. Importantly, it is the final determination of Defendant NAD Director, rather than the underlying decision of Defendant NRCS, that the Court reviews in accordance with the APA. *See Epp v. Nat. Res. Conservation Serv.*, 425 F. Supp. 3d 1142, 1147 (D. Neb. 2019) (cleaned up); *accord Foster v. Vilsack*, No. CIV. 13-4060-KES, 2014 WL 5512905, at *3 (D.S.D. Oct. 31, 2014), *aff'd*, 820 F.3d 330 (8th Cir. 2016).

The APA standard of review provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," and "shall hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

---

[16] Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [*i.e.*, in a case when an administrative hearing is required] or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2)(A). Thus, the court "reviews an agency's reasoning to determine whether it is 'arbitrary and capricious,' or, if bound up with a record-based factual conclusion, to determine whether it is supported by 'substantial evidence.'" *First Tennessee Bank Nat. Ass'n v. Johanns*, 618 F. Supp. 2d 778, 791 (M.D. Tenn. 2008), *amended in part sub nom. First Tennessee Bank Nat'l Ass'n v. Johanns*, No. 1-05-0027, 2009 WL 10727933 (M.D. Tenn. Feb. 11, 2009) (citing *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)).

The APA's "arbitrary or capricious standard" requires the court to ask whether the party challenging the agency's action has shown that the that the action had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations. *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cty.*, 286 F.3d 382, 389 (6th Cir. 2002); *accord Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 354 (6th Cir. 2003) ("The arbitrary and capricious standard is the most deferential standard of judicial review of agency action, upholding those outcomes supported by a reasoned explanation, based upon the evidence in the record as a whole."). "An agency decision would normally be considered arbitrary and capricious if its decision was based on factors that Congress did not intend it to consider; if the agency entirely failed to consider an important aspect of the problem; or if the agency offered an explanation for its decision that ran counter to the evidence before the agency or was so

15

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *First Tennessee Bank Nat. Ass'n*, 618 F. Supp. 2d at 791 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The APA's "substantial evidence" standard requires a court to ask whether a "reasonable mind might accept" a particular evidentiary record as "adequate to support a conclusion." *Dickinson*, 527 U.S. at 162. "Substantial evidence review gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree which could satisfy a reasonable factfinder." *First Tennessee Bank Nat. Ass'n*, 618 F. Supp. 2d at 792 (internal quotation marks omitted) (citing *Wilson Air Center, LLC v. F.A.A.*, 372 F.3d 807, 813 (6th Cir. 2004)).

As detailed above, the APA's "arbitrary or capricious standard" and "substantial evidence" standard are two of six provisions found in 5 U.S.C. § 706(2). *Id.* The two standards are separate standards, and, although an agency's final action may be supported by substantial evidence, the action may still reflect arbitrary and capricious action. *Association of Data Processing Service Organizations, Inc. v. Board of Governors*, 745 F.2d 677, 683-84 (D.C. Cir. 1984) (Scalia, J.); *First Tennessee Bank Nat. Ass'n*, 618 F. Supp. 2d at 792 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

III. **ANLAYSIS**

Plaintiff asserts that Defendant NAD Director applied the wrong standard of review to the wrong entity and abused his discretion in doing so. (Docs. 37, 39, 41) (relying primarily on 7 C.F.R. § 11.9(d)(1)). Specifically, Plaintiff argues that Defendant NAD

Director should have reviewed the Administrative Judge's decision under the substantial evidence standard of review but, instead, improperly passed over the Administrative Judge's decision and reviewed Defendant NRCS's ineligibility determination under the arbitrary, capricious, and an abuse of discretion standard of review. (Doc. 37 PageID 887-889); (Doc. 39 PageID 908-12); (Doc. 41 PageID 928-34).

The Federal Defendants, in their Motion for Summary Judgment, first assert that Defendant NRCS correctly determined that Plaintiff's application for the agricultural land easement was ineligible because Plaintiff could not provide clear title for the Parcels in light of the USACE flowage easements and this determination was neither arbitrary nor capricious. (Doc. 38 PageID 902-06). The Federal Defendants only address Defendant NAD Director's determination in their Motion for Summary Judgment in the statement of facts. (Doc. 38). Subsequently, in their Response in Opposition to Plaintiff's Motion for Summary Judgment, the Federal Defendants argue that Defendant NAD Director's determination was not arbitrary, capricious, or an abuse of discretion, and was supported by substantial evidence, as the evidence found in the administrative record permitted the Director to reverse the Administrative Judge. (Doc. 40 PageID 922-25) (first acknowledging 7 C.F.R. § 11.9(d)(1)).

Pursuant to 7 C.F.R. § 11.9(d)(1), Defendant NAD Director was to review the Administrative Judge's decision to determine whether the Administrative Judge's decision was supported by substantial evidence. 7 C.F.R. 11.9(d)(1) ("The Director will conduct a review of the determination of the Hearing Officer using the agency record, the hearing record, the request for review, any responses submitted . . . , to determine whether the

decision of the Hearing Officer is supported by substantial evidence.").[17] At one point, Defendant NAD Director acknowledges his regulatory responsibility to review the Administrative Judge's decision to determine whether that decision is supported by substantial evidence. (Doc. 22-8 PageID 413) ("I conduct a review of the Administrative Judge's determination using the entire case record to determine if the decision is supported by substantial evidence.") (citing 7 C.F.R. 11.9(d)(1)). However, at four other points, Defendant NAD Director states that he must review Defendant NRCS's ineligibility determination to determine whether that determination is arbitrary and capricious. In particular, Defendant NAD Director states:

- "I must determine whether NRCS acted arbitrarily and capriciously when it denied Appellant's request to enroll land in the ACEP-ALE program." (Doc. 22-8 PageID 408-09);

- " I review the agency's decision to determine whether it was arbitrary, capricious, or an abuse of discretion." (*Id.* PageID 413) (citing 5 U.S.C. §706(2)(A));

- "I review NRCS's decision under the deferential abuse of discretion standard." (Doc. 22-8 PageID 416);

- "I cannot conclude that NRCS acted arbitrarily and capriciously by denying Appellant's application for funding under the ACEP-ALE program." (*Id.* PageID 418).

---

[17] The Court acknowledges that the governing statute does not specifically impose a substantial evidence standard of review. 7 U.S.C. § 6998; *J.O.C. Farms, LLC. V. Rural Cmty. Ins. Agency, Inc.*, 131 F. Supp. 3d 514, 525 n.11 (E.D.N.C. 2015). As the Court will not manufacture arguments on represented parties' behalf, and neither party questions whether the regulatory imposition of the substantial evidence standard of review in the pertinent regulation is proper, the Court will not resolve that possible issue at this time.

It is clear that the applicable regulation charges Defendant NAD Director with review of the Administrative Judge's January 2018 decision to determine whether that decision is supported by substantial evidence. *See* 7 C.F.R. 11.9(d)(1). It is also clear that the Court must review Defendant NAD Director's August 2018 decision, and not Defendant NRCS's July 2017 ineligibility determination or the Administrative Judge's January 2018 decision. *See Epp*, 425 F. Supp. 3d at 1147; *Foster*, 2014 WL 5512905, at *3. As it is Defendant NAD Director's August 2018 decision being reviewed, the question is not whether Defendant NRCS itself acted arbitrarily or capriciously with respect to its July 2017 ineligibility determination; rather, the question is whether Defendant NAD Director acted arbitrarily or capriciously with respect to his August 2018 reversal of the Administrative Judge's January 2018 decision. *See Epp*, 425 F. Supp. 3d at 1147; *Foster*, 2014 WL 5512905, at *3. A review of Defendant NAD Director's August 2018 decision reveals that it is not clear whether he reviewed the Administrative Judge's January 2018 decision to determine whether that January 2018 decision was supported by substantial evidence. (Doc. 22-8). Defendant NAD Director's August 2018 decision must be set aside as being arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as it is not clear if the Director reviewed the Administrative Judge's January 2018 decision in accordance with the pertinent regulation. *See* 5 U.S.C. § 706(2)(A); *Kroger Co.*, 286 F.3d at 389.

Remand to Defendant NAD Director for reconsideration of the correct entity under the correct standard of review is the appropriate remedy.[18] *See Fla. Power & Light Co. v.*

---

[18] As the Court remands this matter to Defendant NAD Director for reconsideration under the correct legal standard, it need not reach the issue of whether the Defendant NAD Director August 2018's decision is supported by substantial evidence.

*Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Kroger Co.*, 286 F.3d at 387; *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 710 F. Supp. 2d 637, 661 (N.D. Ohio 2010) ("Generally, where a court finds an agency's action arbitrary or capricious, it should remand to the agency rather than conduct a de novo review.").

As a Court of general jurisdiction, the Court is not trained to evaluate, for example, whether reliance on the Cincinnati Area Geographic Information Systems map and USACE flowage easement language—which Plaintiff argues establish that no more than 2% of the Parcels is subject to permanent flooding and no more than 13% of the Parcels is subject to occasional flooding—is more proper than reliance on the USACE maps and USACE flowage easement language—which Federal Defendants argue establish that up to 60% of the Parcels is subject to occasional flooding—in directing direct Defendant NRCS to fund the Agricultural Conservation Easement Program agricultural land easement grant in Plaintiff's favor, as Plaintiff requests the Court so direct. Defendant NAD Director should make that evaluation, as well as others, while reviewing the Administrative Judge's January 2018 decision to determine whether that January 2018 decision is supported by substantial evidence. *Cf. Dawson Farms v. Risk Mgmt. Agency*, 698 F.3d 1079, 1083 (8th Cir. 2012). The court expresses no opinion as to the ultimate outcome in remanding.

Finally, Plaintiff's request for an award of costs and fees under EAJA is premature as final judgment in this matter has yet to occur. *See* 28 U.S.C. § 2412(d)(1)(B) ("A party seeking award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application . . . "); *id.* § 2412(d)(2)(G) (defining "final judgment" as "a judgment that is final and not appealable, and includes an order of settlement"); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 96 (1991) (holding that "final judgment" for purposes of EAJA "means a judgment rendered by a court that terminates the civil action for which EAJA fees may be received. The 30-day EAJA clock begins to run after the time to appeal that 'final judgment' has expired."). Plaintiff may file a motion for fees and other expenses at the appropriate time.

IV. <u>**CONCLUSION**</u>

In light of the foregoing, it is hereby **ORDERED** that:

- Plaintiff's Motion for Summary Judgment (Doc. 37) is **GRANTED in part**, to the extent that it requests that the Court set aside Defendant NAD Director's August 2018 determination, **and DENIED in part** to the extent that it requests that the Court reinstate the Administrative Judge's January 2018 decision, direct Defendant NRCS to fund the Agricultural Conservation Easement Program agricultural land easement grant in Plaintiff's favor, and award costs and fees under EAJA at this time;

- Federal Defendants' Motion for Summary judgment (Doc. 38) is **DENIED**;

- this matter is **REMANDED** to Defendant NAD; and

- this matter is **CLOSED**, and the Clerk will issue a separate **JUDGMENT**.

**IT IS SO ORDERED.**                      /s Michael R. Barrett
                                           Michael R. Barrett, Judge
                                           United States District Court